## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES, LLC, *et. al.*, | Case No. 17-12560 (JKS) |
| Remaining Debtors. | Jointly Administered |
| MICHAEL GOLDBERG, in his capacity as Liquidating Trustee of the WOODBRIDGE LIQUIDATION TRUST, | |
| Plaintiff, | Adv. Pro. No. 19-51069 (JKS) |
| v. | **Related Adv. D.I. 76** |
| DEB BRUNDAGE, | |
| Defendant. | |

### <u>MEMORANDUM OPINION[1]</u>

Before the Court is the Motion for Partial Summary Judgment (the "<u>Motion</u>") filed by Michael Goldberg in his capacity as Liquidating Trustee of the Woodbridge Liquidation Trust (the "<u>Trustee</u>" or "<u>Plaintiff</u>").  Having considered the parties' submissions, and for the reasons discussed below, the Motion will be granted, in part, and denied, in part.

---

[1] This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## PROCEDURAL BACKGROUND[2]

On December 3, 2019, the Trustee commenced this adversary proceeding (the "Adversary Proceeding") by filing the Adversary Complaint for Avoidance and Recovery of Avoidable Transfers (the "Complaint") against the Defendant, Deb Brundage (the "Defendant").[3] The Complaint seeks to avoid and recover monies paid by the Debtors[4] to the Defendant on the grounds that such payments were actually fraudulent and/or constructively fraudulent transfers.

On January 7, 2020, Defendant filed an Answer to the Complaint.[5] Fact discovery closed on August 30, 2024.[6]

On November 1, 2024, the Trustee filed the Motion,[7] together with a Memorandum of Law in Support of the Motion,[8] the declarations of Bradley D. Sharp (the "Sharp Declaration") and Nicholas R. Troszak (the "Troszak Declaration") in support of the Motion,[9] and a Request

---

[2] Citations to D.I. __ reference the docket entries in the lead bankruptcy case, *In re Woodbridge Group of Companies, LLC*, Case No. 17-12560. Citations to Adv. D.I. __ reference the docket entries in this Adversary Proceeding, *Goldberg v. Brundage*, Adv. Pro. No. 19-51069.

[3] Adv. D.I. 1 (Complaint).

[4] The term "Debtors" refers to the Woodbridge Group of Companies, LLC and its affiliated Debtors in the Chapter 11 Cases.

[5] Adv. D.I. 4 (Answer to Adversarial Complaint for Avoidance and Recovery of Avoidable Transfers).

[6] Adv. D.I. 68 at ¶ 3 (Scheduling Order).

[7] Adv. D.I. 76 (Plaintiff's Motion for Partial Summary Judgment (the "Motion")).

[8] Adv. D.I. 77 (Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment (the "Memorandum")).

[9] Adv. D.I. 78 (Declaration of Bradley D. Sharp in Support of Plaintiff's Motion for Partial Summary Judgment) and Adv. D.I. 79 (Declaration of Nicholas R. Troszak in Support of Plaintiff's Motion for Partial Summary Judgment). The Sharp Declaration attaches a conformed copy of the Declaration of Bradley D. Sharp in Support of Confirmation of the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and its Affiliated Debtors (D.I. 2829) (the "Sharpe Confirmation Declaration"), dated October 19, 2018, which attaches, as Exhibit A, the Declaration of Soneet R. Kapila (the "Kapila Declaration"), dated December 18, 2017, a founding partner of KapilaMukamal, LLP, a forensic consulting and insolvency advisory firm that was retained by the United States Securities and Exchange Commission to conduct a forensic accounting investigation in Woodbridge matter. The Sharp Confirmation Declaration, with the attached Kapila Declaration, was admitted into the record at the Confirmation Hearing. *See* Opinion on Confirmation, *In re Woodbridge Grp. of Cos.*, LLC, 592 B.R. 761, 764 (Bankr. D. Del. 2018).

for Judicial Notice.[10]  On December 10, 2024, the pro se Defendant filed a Memorandum in

Response to Motion for Partial Summary Judgment.[11]  On December 31, 2024, the Trustee filed

a Reply in Support of the Motion, including the declarations of Jeffrey P. Nolan (the "Nolan

Declaration") and Nicholas R. Troszak (the "Second Troszak Declaration") in reply to the

Response and in support of the Motion.[12]  On February 12, 2025, a Notice of Completion of

Briefing was filed.[13]  Neither party requested oral argument.  A status conference was held on

October 16, 2025.[14]

## FACTUAL BACKGROUND

### A.  The Chapter 11 Cases

On December 4, 2017 (the "Initial Petition Date"), the Woodbridge Group of Companies,

LLC and certain of its affiliates commenced voluntary cases under chapter 11 of the Bankruptcy

Code; additional affiliates filed petitions the following year (collectively, the "Chapter 11

Cases").[15]

On October 24, 2018, the Court held a contested hearing (the "Confirmation Hearing")[16]

on the Debtors' First Amended Joint Chapter 11 Plan of Liquidation (the "Plan").[17]  On October

26, 2018, the Court issued its Opinion on Confirmation[18] and entered an order confirming the

---

[10]  Adv. D.I. 80 (Request for Judicial Notice in Support of Plaintiff's Motion for Partial Summary Judgment). Citations to "RJN" reference the Request for Judicial Notice.

[11]  Adv. D.I. 82 (Memorandum in Response to Motion for Partial Summary Judgment (the "Response")).

[12]  Adv. D.I. 83 (Plaintiff's Reply in Support of Motion for Partial Summary Judgment (the "Reply")).

[13]  Adv. D.I. 85 (Notice of Completion of Briefing Regarding Plaintiff's Motion for Partial Summary Judgment).

[14]  Adv. D.I. 94.

[15]  Additional affiliates filed petitions on February 9, 2018, March 9, 2018, March 23, 2018, and March 27, 2018.

[16]  *See* D.I. 2888 (Tr. of Oct. 24, 2018, Hr'g).

[17]  *See* D.I. 2397.

[18]  *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761 (Bankr. D. Del. 2018) (the "Opinion on Confirmation"); D.I. 2903.

Plan.[19]  The Opinion on Confirmation and Confirmation Order contain a finding that Woodbridge

was operated as part of a Ponzi scheme.[20]  The effective date of the Plan occurred on February

15, 2019 (the "Effective Date").[21]

Pursuant to the Plan, on the Effective Date, the Liquidation Trust was established to

pursue or liquidate Liquidation Trust Assets and make distributions for the benefit of the

Liquidation Trust Beneficiaries.[22]  The Liquidation Trust, as successor in interest to the Debtors,

has the right and power to file and pursue any and all "Liquidation Trust Actions" without any

further order of the Bankruptcy Court.[23]

### B.  The Ponzi Scheme[24]

Under Robert Shapiro's ("Shapiro") control and during the period from August 2012

through December 1, 2017, the prepetition Debtors raised more than $1.29 billion from over

10,000 unsuspecting investors nationwide by selling those investors two primary products: five-

year "Units" and twelve- to eighteen-month "Notes."[25]  The prepetition Debtors represented that

---

[19]  D.I. 2903 (Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors) (the "Confirmation Order"). The Plan is Exhibit A to the Confirmation Order.

[20]  D.I. 2903 (Confirmation Order) at ¶ NN; *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. 761.

[21]  D.I. 3421 (Notice of Effective Date).

[22]  D.I. 2903 (Confirmation Order), Ex. A. Plan §§ 1.75 and 5.4.3.  "Liquidation Trust Actions" include, inter alia, "all Avoidance Actions and Causes of Action held by the Debtors or the Estates . . . ."  D.I. 2903, Ex A. § 1.76.  *See also In re Woodbridge Grp. of Cos.*, LLC, 592 B.R. 761, 766 n.31 (Bankr. D. Del. 2018) ("The Liquidation Trust Actions include, but are not limited to, causes of action, claims, remedies, or rights that may be brought by or on behalf of the Debtors or the Estates under chapter 5 of the Bankruptcy Code and related statutes or common law, as well as any other claims, rights, or causes of action held by the Debtors' Estates.").  "Avoidance Actions" include "[a]ny and all causes of action . . . that may be brought by or on behalf of the Debtors or the Estates under Bankruptcy Code section[] . . . 548."  D.I. 2903 (Confirmation Order), Ex A (Plan), at § 1.5.

[23]  D.I. 2903 (Confirmation Order), Ex. A (Plan) at § 5.4.15.

[24]  The overview of the Ponzi Scheme set forth in the Memorandum cites to the Sharp Confirmation Declaration. The factual background regarding the Ponzi Scheme is also included in "The Ponzi Scheme Summary" contained in the Opinion on Confirmation, *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 765-766.

[25]  *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 765.

the Units and Notes would be repaid based on the purported revenues the Debtors would receive from issuing short-term loans to unrelated third-party property owners.[26] "As marketed by the prepetition Debtors, the Debtors would make short-term loans, between $1 million and $100 million, to bona-fide third-party commercial property borrowers at high rates of interest, approximately 11%–15%, secured by first-position mortgages on real properties owned by the borrowers. These loans to third parties would supposedly be provided at loan-to-value ratios of approximately 60%–70%."[27] The result, according to the sales pitch, would be a robust, safe cash-flow stream that would provide revenues for the Debtors to repay the Units and the Notes.[28]

In reality, there was no robust and safe cash-flow stream from third-party borrowers, as a very small fraction of investor money flowed from the Debtors to unrelated third parties. Rather, Shapiro created disguised affiliates to which money was loaned, and which sometimes (but not always) purchased real estate assets with the funds. These "borrowers" did not have bank accounts or any ability to service the required interest payments on an ongoing basis. In addition, they had no ability to retire the debt when due, other than through the sale of real estate, which did not appear to have been contemplated and was not effectuated.

"[T]he annual cash flow from sales [of real property] (which sales were not frequent) was well below the amount of principal and interest paid by Shapiro to investors."[29] For example, as explained in the Sharp Confirmation Declaration, in 2015, $84.1 million in principal and interest payments were made to investors, while the net proceeds of real property sales were only $18.5 million. In 2016, $138.2 million in principal and interest payments were made to investors,

---

[26] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 22.

[27] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 22.

[28] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 22.

[29] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

while the net proceeds of real property sales were only $28.4 million.  In 2017, $181.8 million in principal and interest payments were made to investors, while the net proceeds of real property sales were only $71.4 million.[30]  These figures demonstrate that property sales were insufficient to cover payments of principal and interest, and there was no other material source of revenue to make such payments other than from the sale of additional Notes and Units.[31]

The prepetition Debtors used funds received primarily from new investors to make payments of approximately $425 million of "interest" and "principal" to existing investors. "Shapiro also used commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold the fraudulent 'investments' and used investor money to pay at least $30 million for the benefit of Shapiro and his wife, as well as their related entities . . . ."[32]  While funds from the commingled account were used to purchase the Debtors' real properties, these purchases were directly contrary to material representations made to investors.

Moreover, investments were solicited, and payments of "interest" were made to existing investors, without regard to whether such investors' investments realized value (or even existed). For example, on certain occasions, Shapiro issued Notes . . . [for] properties that the Debtors never actually acquired . . . ."[33]

"In late 2017, Shapiro's fraudulent scheme unraveled.  As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors.  As noted above, the prepetition

---

[30]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

[31]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

[32]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 25.

[33]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 26.

Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders.  When new investment dried up, the inability to make the required servicing payments on the Notes and the Units became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017, interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases."[34]

### C.  Defendant's Role and Payments from the Debtors

The Defendant "worked as an outside broker who was recruited by the Debtors to refer investors to the Debtors for the purchase of First Position Commercial Mortgages ["FPCMs"] . . . for which she received commissions."[35]

The brokers, including Defendant, sold FPCMs, in the form of Notes and Units, issued by Woodbridge to investors.[36]  The process included the brokers locating or marketing to Investors FPCM as documented in "senior position packages," as they were sometimes referenced, which included primarily four documents: (a) Promissory Note in favor of the lender to memorialize the loan, (b) Form of Assignment, (c) Form of Collateral Assignment, and (d) Form of Intercreditor Agreement.[37]  "Once the Debtors exchanged the aforementioned forms and confirmed receipt of funds from Investors, the Debtors would issue a letter or email to the broker confirming the investment which would trigger payment of a commission to the broker."[38]

To promote the FPCMs, brokers were issued and circulated to prospective investors Woodbridge marketing items.[39]  In the marketing materials, "the Debtors claimed that

---

[34]  D.I. 2829 (Sharp Confirmation Decl.) at ¶ 27.

[35]  Adv. D.I. 79 (Troszak Decl.) at ¶ 8.

[36]  Adv. D.I. 79 (Troszak Decl.) at ¶ 9.

[37]  Adv. D.I. 79 (Troszak Decl.) at ¶ 9.

[38]  Adv. D.I. 79 (Troszak Decl.) at ¶ 9.

[39]  Adv. D.I. 79 (Troszak Decl.) at ¶ 10.

'Woodbridge funds 1-year bridge loan' to property owners.  The Debtors touted how they 'thoroughly evaluate[d]', appraised each property and performed a title search (even though in reality, the underlying properties were owned by the Debtors).  Each property was represented to 'hold a low loan-to-value (LTV) ratio[].'  The investments in FPCMs were represented to be 'secured' loans, with the Debtors offering investors 'assurance that their funds are secured by commercial real estate.'  The brochure described FPCMs as a 'safer alternative to help our clients reach their financial goals.'"[40]

Between 2016 and the Initial Petition Date, the Defendant sold Notes and was paid commissions out of the Debtors' main operating account totaling $55,989.00.[41]  Exhibit A to the Complaint sets forth details regarding the commission payments.[42]

### D.  The Debtors' and Defendant's Securities Law Violations

Between 2015 and the Petition Date, various states issued cease-and-desist orders prohibiting the Debtors' securities.[43]

"Defendant continued to sell the FPCM after the various consent decrees issued by states and the coverage by various publication as evidenced by the Commission ledger, included in Exhibit 4 . . . ."[44]

---

[40]  Adv. D.I. 79 (Troszak Decl.) at ¶ 10 and Ex. 3.

[41]  Adv. D.I. 79 (Troszak Decl.) at ¶ 11-12.

[42]  Adv. D.I. 1 (Compl.), Ex. A.  The commission payment ledger is also attached to the Troszak Declaration as Exhibit 4.  Adv. D.I. 79 (Troszak Decl.) at ¶ 12 and Ex. 4.

[43]  Adv. D.I. 79 (Troszak Decl.) at ¶ 13.  *See also* RJN, Ex. C (May 4, 2025 consent order in the Commonwealth of Massachusetts); RJN, Ex. D (July 17, 2015 emergency cease-and-desist order issued by State of Texas Securities Board); RJN, Ex. E (October 4, 2016 temporary restraining order issued by the Securities Division of the State of Arizona); RJN, Ex. F (April 24, 2017 consent agreement and order between the Commonwealth of Pennsylvania and Woodbridge Structured Funding LLC); RJN, Ex. G (August 8, 2017 cease-and-desist notice issued by Michigan Department of Licensing and Regulatory Affairs).

[44]  Adv. D.I. 79 (Troszak Decl.) at ¶ 14.

### E.  The Complaint

The Complaint alleges that the "Defendant acted as a financial advisor and/or broker who sold securities to the public and provided investment services."[45]  The Complaint further alleges that the Defendant sold Notes and Units, created marketing materials and sales scripts to facilitate the sale of Notes and Units to unsuspecting Investors.[46]  In so doing, the Trustee alleges that the Defendant made materially false and fraudulent statements to induce Investors to provide money.[47]  The Trustee further contends that in connection with such conduct, Defendant, directly or indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mail.[48]

The Trustee alleges that within the two years preceding the Initial Petition Date, Defendant received transfers totaling not less than $55,989.00 (the "Transfers"), including commission payments and other compensation, as set forth on Exhibit A to the Complaint.  The Complaint contains four claims:

> The First and Third Claims seek avoidance and recovery of actual intent fraudulent transfers under section 548(a)(1)(A) of Bankruptcy Code and California Civil Code § 3439.04(a)(1).

> The Second and Fourth Claims seek avoidance and recovery of constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code and California Civil Code § 3439.04(a)(2).

---

[45]  Adv. D.I. 1 (Compl.) at ¶ 12.

[46]  Adv. D.I. 1 (Compl.) at ¶ 13.

[47]  Adv. D.I. 1 (Compl.) at ¶ 13.

[48]  Adv. D.I. 1 (Compl.) at ¶ 13.

On all Claims, the Trustee seeks an award of prejudgment interest as permitted by law, costs of suit, and such other and further relief as is just and proper.[49]

### F.  The Motion for Summary Judgment

The Trustee seeks summary judgment on Claims One through Four in the Complaint in his favor and against the Defendant.[50]

## JURISDICTION

The Court has subject matter jurisdiction over this Adversary Proceeding under 28 U.S.C. §§ 157 and 1334(b) and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## LEGAL STANDARD

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[51]  An issue is genuine if there is a "sufficient evidentiary basis" on which a reasonable factfinder could find for the non-movant, and a factual dispute is material "only if it might affect the outcome of the suit under governing law."[52]

---

[49] *See, e.g.,* Adv. D.I. 1 (Compl.).

[50] In the Memorandum, the Trustee states: "Here, the Liquidating Trustee seeks partial summary judgment on his First, Third, Fourth, and Fifth Claims for Relief . . . ."  Adv. D.I. 77 (Mem.) at ¶ 39.  This is a typographical error as the Complaint does not contain a fifth claim.  Furthermore, the Motion and Memorandum specifically reference the second claim.  *See* D.I. 77 (Mem.) at ¶¶ 3, 4, 8, 69.

[51] Fed. R. Civ. P. 56, as made applicable to this contested matter by Fed. R. Bankr. P. 9014(c) and Fed. R. Bankr. P. 7056.  *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

[52] *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006).

The movant bears the initial burden of proving that it is entitled to relief and to demonstrate the absence of any genuine issue of material fact.[53]  Once the movant has met its burden, the non-movant "must counter with evidence that demonstrates a genuine issue of fact."[54]  The non-movant must adduce more than a mere scintilla of evidence in its favor.[55]  It cannot simply reassert factually unsupported allegations contained in its pleadings.[56]  A material fact is one which "could alter the outcome" of the case.[57]  It is genuine when it is "triable," that is, when reasonable minds could disagree on the result.[58]

When considering a motion for summary judgment, the court must make its determination based upon the materials in the record, which may include depositions, documents, affidavits or declarations, and products of discovery.[59]  The court must view the evidence in the light most favorable to the non-movant and "draw all reasonable inferences in favor of the non-moving party."[60]  At the summary judgment stage, the Court does not "weigh the evidence and determine the truth of the matter;" rather, it determines "whether there is a genuine issue for trial."[61]

If a court finds that there is no genuine dispute of material fact, it may enter judgment as a matter of law, either for or against the movant, in full or in part, applying the applicable

---

[53]  *Celotex Corp. v. Catrett,* 477 U.S. at 323.

[54]  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

[55]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

[56]  *Big Apple BMW, Inc.*, 974 F.2d at 1363.

[57]  *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995).

[58]  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[59]  Fed. R. Civ. P. 56(c).

[60]  *Fields v. Thompson Printing Co.*, 363 F.3d 259, 265 (3d Cir. 2004) (citation omitted); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d at 1363 (holding that "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.") (citations omitted).

[61]  *Anderson*, 477 U.S. at 249.

substantive law.[62]  "When the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial."[63]

## **DISCUSSION**

### A. The Parties' Arguments

The Trustee seeks to avoid the Transfers under theories of both actual fraud and constructive fraud under the Bankruptcy Code and California State law.[64]  First, the Trustee argues that the Transfers are avoidable as actual fraudulent transfer (First and Third Claims) because the existence of a Ponzi scheme is sufficient to establish actual intent to hinder, delay, or defraud creditors under the Bankruptcy Code and state law.  The Trustee also contends that the "badges of fraud" independently establish the actual intent to defraud.  Second, the Trustee argues that the Transfers are avoidable as constructive fraudulent transfers (Second and Fourth Claims) because the Debtors were insolvent, and the Debtors received no value for the Transfers.

The Defendant asserts the following defenses: (1) the Defendant did not know she was participating in a fraudulent scheme, (2) the evidence does not prove the Defendant actually received payments from the Debtors, (3) the evidence relied upon by the Trustee is inadmissible hearsay, and (4) the Debtors' wrongdoing must be imputed to the Trustee because the Trustee stands in the shoes of the Debtors.

---

[62]  Fed. R. Civ. P. 56(a), (f).

[63]  *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*citing Munger v. City of Glasgow Police Dep't,* 227 F.3d 1082, 1087 (9th Cir. 2000)).

[64]  *See generally* Adv. D.I. 1 (Compl.).

## B. First and Third Claims:  Actual Intent Fraudulent Transfers

The First and Third Claims seek the avoidance and recovery of actual intent fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code section 3439.04(a)(1), respectively.

Section 548(a)(1) of the Bankruptcy Code provides, in relevant part, that a trustee may avoid a transfer of an interest of the debtor in property that was made within two years before the petition date with "actual intent to hinder, delay, or defraud" creditors.[65]

Section 544(b) of the Bankruptcy Code permits a trustee to avoid any transfer of a debtor's property that would be avoidable by an unsecured creditor under applicable state law.[66] Under the California Uniform Voidable Transactions Act (the "CUVTA"),[67] section 3439.04(a)(1) of the California Civil Code, the "actual intent" inquiry is the same as under section 548(a)(1)(A) of the Bankruptcy Code.[68]  The CUVTA, however, provides for a four-year lookback period.[69]

---

[65] *Id.* § 548(a)(1)(A).

[66] *Id.* § 544(b).

[67] Cal. Civ. Code §§ 3439–3439.14.0.  The Plaintiff asserts, and the Defendant does not dispute, that California is the applicable state law.  The voluntary petition for The Woodbridge Group of Companies, LLC identified the Debtor's principal place of business as 14225 Ventura Boulevard, Sherman Oaks, CA 191423.  *See* D.I. 1 (Compl.).

[68] Cal. Civ. Code § 3439.04(a)(1) provides:

> (a) A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
> > (1)  With actual intent to hinder, delay, or defraud any creditor of the debtor.

In California, the CUVTA supersedes the Uniform Fraudulent Transfer Act (UFTA).  The CUVTA applies to transfers made or obligations incurred after January 1, 2016.  However, the case law under the UFTA has been consistently applied to the CUVTA.  *See Aghaian v. Minassian*, 59 Cal. App. 5th 447, 455 n.8 (2020) ("The enactment did not alter the essential elements of a cause of action for a fraudulent or voidable transfer.").

[69] Cal. Civ. Code § 3439.09 provides:

> A cause of action with respect to a transfer or obligation under this chapter is extinguished unless action is brought pursuant to subdivision (a) of Section 3439.07 or levy made as provided in subdivision (b) or (c) of Section 3439.07:

### 1. The Payments to Defendant Were Transfers of Debtors' Property

A "transfer" under the Bankruptcy Code is defined as "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."[70]  Similarly, under the California Civil Code a "transfer" is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money . . . .").[71]

Exhibit A to the Complaint identifies ten Transfers from the Debtors to the Defendant, between February 6, 2016, and October 12, 2016 (within two years of the Initial Petition Date). The record establishes that the payment of monies to Defendant out of the Debtors' main operating account were "transfers" of the Debtors' property.[72]

### 2. The Transfers Were Made with Actual Intent to Hinder, Delay, or Defraud Creditors

The Trustee relies on the Ponzi scheme presumption to establish that the Transfers were made with actual intent to defraud.  The Ponzi scheme presumption posits that "all payments made by a debtor in furtherance of a Ponzi scheme are made with actual fraudulent intent."[73]  "If

---

       (a) Under paragraph (1) of subdivision (a) of Section 3439.04, not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant.

[70]  11 U.S.C. § 101(54)(D).

[71]  Cal. Civ. Code § 3429.01(m).

[72]  Adv. D.I. 79 (Troszak Decl.) at ¶ 12.

[73]  *Zazzali v. AFA Fin. Grp., LLC (In re DBSI, Inc.)*, 477 B.R. 504, 510 (Bankr. D. Del. 2012) (quoting *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 658 (Bankr. M.D. Fla. 2002).  *See also Carickhoff v. Cantor (In re Live Well Financial, Inc.)*, Adv. Pro. No. 21-50990 (LSS), 2023 WL 3995900, *16 (Bankr. D. Del. June 13, 2023); *Barclay v. Mackenzie (In re AFI Holding, Inc.),* 525 F.3d 700, 704 (9th Cir. 2008) ("We allow 'a finding of fraudulent intent under section 548(a)(1) [the analog to § 3439.04(a)] on the basis of circumstantial evidence.' Furthermore, 'the mere existence of a Ponzi scheme' is sufficient to establish actual intent under § 548(a)(1) or a state's equivalent to that section.") (internal citation omitted); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87, 104 (Bankr. S.D.N.Y. 2011) (citations omitted) ("There is a presumption of

the underlying fraud constitutes a Ponzi scheme, and if the transfer at issue serves to further that

scheme, 'actual intent' under the Bankruptcy Code [or Uniform Fraudulent Transfer Act] is

presumed."[74]  As the Ninth Circuit recently explained in *Kirkland v. Rund*:

> Although the Bankruptcy Code contains no provision specifically
> directed at Ponzi schemes, this Court has long recognized a
> presumption under which a debtor's actual intent to hinder, delay
> or defraud its creditors may be inferred from the mere existence of
> a Ponzi scheme.  This is called the Ponzi scheme presumption.[75]

Even when a Ponzi scheme is present, the presumption does not relieve the Trustee of the

burden to show that the transfers at issue were made "in furtherance of" the Ponzi scheme.[76]

This is because even where the plaintiff has alleged the existence of a broad, fraudulent scheme,

"the court must focus precisely on the specific transaction or transfer sought to be avoided in

order to determine whether that transaction falls within the statutory parameters of an actually

---

actual intent to defraud because 'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'"); *Perkins v. Haines*, 661 F.3d 623, 626 (11th Cir. 2011); *Hafen v. Howell*, 121 F.4th 1191, 1200 (10th Cir. 2024); *Tabor v. Davis (In re Davis)*, Nos. 05-15794-L, 2016 WL 11696269, *9 (Bankr. W.D. Tenn. June 14, 2016); *Bash v. Textron Fin. Corp.*, 483 B.R. 630, 656 (N.D. Ohio 2012).

[74]  *Picard v. Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, Adv. Pro. No. 09-1182 (BRL), 2011 WL 3897970, *4 (S.D.N.Y. Aug. 31, 2011) (citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007)); *see also Carickhoff v. Cantor, et al. (In re Live Well Financial, Inc.)*, Adv. Pro. No. 21-50990 (LSS), 2023 WL 3995900 at *16 (Finding that "[t]he applicability of the Ponzi scheme presumption turns on a plaintiff's ability to demonstrate both that a Ponzi scheme existed and the specific transfers at issue were in furtherance of the Ponzi scheme.").  *But see Stoebner v. Opportunity Fin., LLC*, 562 B.R. 368, 384 (D. Minn. 2016) (applying Minn. fraudulent transfer law) ("It is also worth noting that courts have begun to move away from recognizing the Ponzi presumption because it "allow[s] a [plaintiff] to bypass the proof requirements of a fraudulent transfer claim.") (internal quotations and citation omitted); *see also Janvey v. GMAG, L.L.C.*, 592 S.W.3d 125, 129 (Tex. 2019) (applying Tex. fraudulent transfer law) (failing to acknowledge the existence of a Ponzi presumption for actual fraudulent transfer claim related to a Ponzi debtor and instead establishing that the nonexclusive badges of fraud may be used to show fraudulent intent).

[75]  *Kirkland v. Rund (In re EPD Inv. Co., LLC)*, 114 F.4th 1148, 1158 (9th Cir. 2024) (internal quotation and citation omitted).

[76]  *In re DBSI, Inc.*, 477 B.R. at 511 (citations omitted); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. at 11 (noting that the court must determine "whether the transfers at issue were related to a Ponzi scheme" before it can apply the Ponzi presumption); *Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) ("To rely on the Ponzi scheme presumption, the trustee must allege the debtors' loan repayments were somehow in furtherance of [the] . . . Ponzi schemes.").

fraudulent transfer."[77]   In sum, the Trustee must prove the Debtors were engaged in a Ponzi

scheme and that the Transfers were related to or in furtherance of the scheme.[78]

Here, the existence of a Ponzi scheme has been established[79] and is the law of the case.[80]

More specifically, after weighing the evidence at the contested Confirmation Hearing, the Court

issued the Opinion on Confirmation accepting "the conclusions of Mr. Kapila and Mr. Sharp that

the Debtors were operated as a Ponzi scheme"[81] and specifically finding that "the Debtors were

operated as part of a massive Ponzi scheme."[82]   In addition, the Confirmation Order contained

the following findings regarding the existence of the Ponzi scheme:

> The evidence demonstrates, and the Bankruptcy Court hereby
> finds, that (i) beginning no later than July 2012 through December
> l, 2017, Robert H. Shapiro used his web of more than 275 limited
> liability companies, including the Debtors, to conduct a massive
> Ponzi scheme raising more than $1.22 billion from over 8,400
> unsuspecting investors nationwide; (ii) the Ponzi scheme involved
> the payment of purported returns to existing investors from funds
> contributed by new investors; and (iii) the Ponzi scheme was
> discovered no later than December 2017.[83]

The Confirmation Order is a final, non-appealable order.   The Court's findings and conclusions

are binding in this litigation.   There is no genuine dispute that the Debtors operated a Ponzi

scheme.

---

[77]   *In re DBSI, Inc.*, 477 B.R. at 511 (cleaned up; quoting *Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Grp., LLC)*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007)).

[78]   *Id.*

[79]   *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 763.

[80]   The law of the case doctrine "prevents reconsideration of legal issues already decided in earlier stages of a case." *Bedrosian v. IRS*, 42 F.4th 174, 181 (3d Cir. 2022).

[81]   *In re Woodbridge Grp. of Cos., LLC*, 592 B.R. at 763.

[82]   *Id.* at 779.

[83]   D.I. 2903 (Confirmation Order) at ¶ NN.

A Ponzi scheme having been established, the Trustee must therefore show that the Transfers were made "in furtherance of" that scheme.  The Trustee argues that when brokers are paid commissions for their efforts promoting a Ponzi scheme, the commissions are fraudulent transfers under sections 548 and 544.

Courts in various jurisdictions have concluded that commission payments to salespeople, brokers, and agents for bringing in new investors are transfers made "in furtherance of" a Ponzi scheme.[84]  In *In re Bernard L. Madoff Inv. Sec. LLC*, the trustee sought to avoid and recover commissions and fees paid to an entity that recruited and referred victims to a Ponzi scheme.  In that case, the bankruptcy judge observed, "it is conceivable that 'certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply,'" but found that commissions were "clearly tainted as payments from a Ponzi schemer to an individual to reward them for locating new investors."[85]  Similarly, in *In re World Vision Entertainment, Inc.*, the Court observed:  "A Ponzi scheme is by definition fraudulent.  By extension, any acts taken in furtherance of the Ponzi scheme, such as paying brokers' commissions, are also fraudulent. Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay, or defraud creditors, primarily the new investors."[86]  Likewise, in *In re Randy*,

---

[84]  *See e.g. In re DBSI, Inc.*, 477 B.R. at 512; *In re Bayou Grp. LLC*, 439 B.R. at 307-08; *In re World Vision Entm't, Inc.*, 275 B.R. at 657 ("The debtor recruited insurance agents to sell its promissory notes and paid the brokers commissions . . . Without question, the debtor paid these commissions with the actual intent to defraud both current and future investors.").

[85]  *Picard v. Cohmad Securities Corp.* (*In re Bernard L. Madoff Inv. Sec. LLC*), 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) (citation and internal quotation marks omitted).

[86]  *In re World Vision Ent., Inc.*, 275 B.R. at 656. *But see Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001) (Holding that commissions that Chapter 7 debtor, in its capacity as operator of alleged Ponzi scheme, paid to brokers for originating mortgages and soliciting additional investors in good faith, without knowledge that debtor was operating Ponzi scheme, were not subject to avoidance as *constructively fraudulent transfers* on theory that brokers' services, which merely prolonged Ponzi scheme and permitted debtor to incur debts to additional investors, had not conferred financial benefit on debtor but had only deepened debtor's insolvency, where trustee did not contend that commission payments were in any way disproportionate to commissions paid for like services in marketplace; in deciding whether debtor had received "reasonably equivalent value," bankruptcy

17

the trustee sought to recover commissions paid by the debtor to defendant brokers "for their efforts in coopting new investors" into a Ponzi scheme.[87]  There, the Bankruptcy Court for the Northern District of Illinois explained:

> The underlying reasoning that courts have used to find that profits paid in a Ponzi scheme to innocent investors are fraudulent transfers applies equally well to commissions paid to brokers who promoted or aided the investment scheme, whether or not they had any culpable intent.  Therefore, as a matter of law, when brokers are paid commissions for their efforts in promoting a Ponzi scheme, these commissions are fraudulent transfers under §§ 548 and 544 of the Code.[88]

In *DBSI, Inc.*, the trustee alleged that the Ponzi scheme was propped up by the sale of tenant-in-common ("TIC") interests which were sold through a real estate channel and licensed real estate brokers and/or agents sold the interests to investors, who received a commission or referral fee for their sales efforts.[89]  The Delaware Bankruptcy Court reasoned: "Such commissions and referral fees in this context would be made in furtherance of the DBSI Ponzi scheme, as the scheme was dependent upon the brokers/agents' sales of TIC interests to generate cash flow."[90] The Court found the Ponzi scheme presumption applicable to show fraudulent intent, and found the trustee had adequately stated a claim for the avoidance of actual fraudulent transfers under section 548(a)(1)(A).

---

court could not consider significance of payments in Ponzi scheme as whole, but could only compare amount of commissions with value of brokerage services performed.).

[87]  *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995).

[88]  *Id*.

[89]  *In re DBSI, Inc.,* 476 B.R. at 422-23.

[90]  *In re DBSI, Inc.,* 476 B.R. at 423 (citations omitted) ("Consequently, the Ponzi presumption is applicable here to show fraudulent intent, and Trustee has adequately stated a claim for the avoidance of actual fraudulent transfers under § 548(a)(1)(A)."). *See also World Vision Ent'mt,* 275 B.R. at 657 (holding that commission payments to brokers who sold promissory notes were fraudulent transfers where the note sales were the primary source of funds supporting the debtor's Ponzi scheme).

Here, the record establishes that Defendant was an outside broker or "salesperson" recruited by the Debtors to sell FPCMs to investors.[91]  The Defendant found new investors to refer to the Debtors.[92]  In exchange for recruiting the new investors, the Defendant was paid commissions totaling $55,989.00 from the Debtors' main operating account within the two years prior to the Initial Petition Date.[93]  The Opinion on Confirmation found that "Debtors used funds received primarily from new investors to make payments of . . . 'interest' and 'principal' to existing investors.  Shapiro also used commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold the fraudulent 'investments' . . . ."[94] On this record, the Court finds that commission payments to the Defendant were in furtherance of the Ponzi scheme as the scheme was dependent on the sale of FPCMs to generate cash flow to pay principal and interest to existing investors.  Taking the Declarations and Exhibits as a whole, the Court finds that Transfers were made in furtherance of the Ponzi scheme.

The Court concludes that the Ponzi scheme presumption is applicable to show fraudulent intent, and that the Trustee has established that the Transfers were made with the intent to hinder, delay, or defraud creditors under section 548(a)(1)(A) of the Bankruptcy Code and California Civil Code section 3439.04(a)(1).

---

[91]  Adv. D.I. 79 (Troszak Decl.) at ¶ 8.  In her Response, the Defendant concedes: "defendant was a sales person for Debtor."  Adv. D.I. 82 (Response) at 1.

[92]  Adv. D.I. 79 (Troszak Decl.) at ¶ 9; *see also* Adv. D.I. 82 (Response and Declaration of Deb Brundage in Support of Defendant's Response (the "Brundage Decl.")) at ¶ 4.

[93]  Adv. D.I. 79 (Troszak Decl.) at ¶ 12.

[94]  *In re Woodbridge Group of Companies, LLC*, 592 B.R. at 766 (footnotes omitted).

### 3. The Defenses Asserted Do Not Give Rise to Any Genuine Issue of Material Fact

The Trustee having met its burden of demonstrating the absence of any genuine issues of material question of fact, the Court next considers whether the Defendant's Response sets forth any specific facts or evidence showing that there is a genuine issue for trial.

As a threshold matter, the Defendant does not dispute the existence of a Ponzi scheme, and concedes she was a "sales person" for the Debtors[95] who found potential investors to refer to Woodbridge.[96] The Defendant, however, argues that she did not know she was participating in an illegal Ponzi scheme or that the transfers were ill-gotten gain.[97] Courts have established that fraudulent conveyances under section 548(a)(1)(A) are determined by reference to *the intent of the debtor-transferor* in making the transfer; "the state of mind of the transferee is irrelevant."[98] Therefore, the Defendant's clean state of mind is not a defense to the Trustee's action.

Second, the Defendant alleges the Trustee fails to show what commissions were paid. She argues that no payment was actually made on the ten commissions identified on Exhibit A to the Complaint.[99] To support this argument, the Defendant relies on the phrase "DO NOT CUT CKS" located next to her name in each ledger entry on Exhibit A.[100] The Defendant argues the phrase means no commissions were paid.[101]

---

[95] Adv. D.I. 82 (Response) at p. 1.

[96] Adv. D.I. 82 (Brundage Decl.) at ¶ 4.

[97] Adv. D.I. 82 (Response) at p. 12.

[98] *In re Bayou Grp., LLC*, 439 B.R. at 304; *In re Live Well Fin., Inc.*, 652 B.R. at 705 ("It is the intent of the transferor, not the transferee, that must be established."); *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 709 (Bankr. D. Del. 2010); *In re Bernard L. Madoff Inv. Sec. LLC*, Adv. Pro. No. 09-1182 (BRL), 2011 WL 3897970 at *3; *In re Davis*, Nos. 05-15794-L, 2016 WL 11696269 at *9; *Trauner v. SEICO, Inc. (In re Carter Bros. Sec. Servs., LLC)*, Adv. Pro. No. 20-06129-JWC, 2021 WL 1157896, *3 (Bankr. N.D. Ga. Mar. 25, 2021).

[99] Adv. D.I. 82 (Response) at p. 13.

[100] Adv. D.I. 1 (Compl.), Ex A; Adv. D.I. 79 (Troszak Decl.), Ex. 4.

[101] Adv. D.I. 82 (Response) at p. 10.

In his Reply, the Trustee relies on the Second Troszak Declaration which includes a W-9 form for the Defendant,[102] as well as copies of the front and back of ten checks issued by the Debtors and made payable to, and endorsed by, the Defendant, totaling $55,989.00.[103]  The amount of each check corresponds to the "Commission Payment" identified on the commission ledger attached as Exhibit A to the Complaint.  In addition, attached to the Second Troszak Declaration are the Debtors' monthly bank statements[104] that establish that each check sent from the Debtors to the Defendant was negotiated and subsequently deposited.[105]

Defendant's conclusory, self-serving statements are insufficient to meet her burden on summary judgment.[106]  Such statements do not rebut the Trustee's contrary documentary evidence.  Thus, based on the evidence presented, there is no genuine question of fact as to whether the Defendant was acting as a broker and received the commission checks (Transfers).

Third, the Defendant argues that the bank statements the Trustee relies on as evidence are inadmissible hearsay because Mr. Troszak does have first-hand knowledge, and because the elements of Federal Rule of Evidence 803(6) are not satisfied.[107]  The Trustee counters that the records are admissible hearsay as records of a regularly conducted activity.[108]

Federal Rule of Civil Procedure 56(c)(4) provides that declarations used to support or oppose summary judgment motions must be made on personal knowledge, set out facts that

---

[102]  Adv. D.I. 83 (Nolan Decl.), Ex A.

[103]  *See* Adv. D.I. 83 (Nolan Decl.), Ex. B.

[104]  Adv. D.I. 83 (Nolan Decl.), Ex. B.

[105]  Adv. D.I. 83 (Nolan Decl.), Ex. B.

[106]  *See Paladino v. Newsome,* 885 F.3d 203, 208 (3d. Cir. 2018) (citations and internal quote marks omitted) (Finding "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment" because it failed to "set forth specific facts that reveal a genuine issue of material fact.").

[107]  *See* Adv. D.I. 82 (Response) at p. 9–11.

[108]  *See* Adv. D.I. 83 (Reply) at ¶¶ 8-9.

would be admissible in evidence, and show that the declarant is competent to testify on the matters stated.[109]  Courts may consider a hearsay statement in passing on a motion for summary judgment if the statement could be "reduced to admissible evidence at trial" or "reduced to admissible form."[110]  If a party fails to properly support an assertion of fact as required by Rule 56(c), the Court may give an opportunity to properly support or address the fact.[111]  The Second Troszak Declaration was submitted to provide foundation to the facts contained in his initial declaration.

Rule 803(6), commonly known as the "business record exception" to the rule against hearsay, "permits the admission of documents containing hearsay" when a "custodian or other qualified witness" provides foundation testimony that:

> (1) the declarant in the records had personal knowledge to make accurate statements; (2) the declarant recorded the statements contemporaneously with the actions that were the subject of the reports; (3) the declarant made the record in the regular course of the business activity; and (4) such records were regularly kept by the business.[112]

The custodian or other qualified person need not be an employee of the entity but must have "familiarity with the record-keeping system and the ability to attest to the [four] foundational requirements."[113]

---

[109] Fed. R. Civ. P. 56(c)(4).

[110] *Williams v. W. Chester*, 891 F.2d 458, 465 n.12 (3d Cir. 1989); *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1246 (3d Cir. 1993); *Macuba v. DeBoer*, 193 F.3d 1316, 1323-24 (11th Cir. 1999) ("For example, the statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all . . . .").

[111] Fed. R. Civ. P. 56(e)(1).

[112] *United States v. Kamra*, No. 21-1615, 2022 WL 4998978, at *5 (3d Cir. Oct. 4, 2022) (quoting *United States v. Pelullo*, 964 F.2d 193, 200 (3d Cir. 1992) (further citation omitted)).

[113] *Id.* (citing *United States v. Console*, 13 F.3d 641, 657 (3d Cir. 1993)).

The Second Troszak Declaration satisfies the foundational requirements.  The declaration states Mr. Troszak did not alter the records in any manner, the records are true and correct copies of the checks and bank statements from Comerica Bank, a bank utilized by the Debtors pre-petition.[114]  His declaration further provides that the monthly bank statements of Comerica Bank have been a regular business record maintained in the business records of the Debtors which were accessed in preparing analysis, general financial statements, and forensic accounting.[115]  Further, the declaration states Comerica Bank produced bank records pursuant to subpoenas issued by the Debtors.[116]  The only remaining question is whether Mr. Troszak is a "qualified person" with familiarity of the record-keeping system and the ability to attest to the foundational requirements.

The Court finds Mr. Troszak has familiarity and can attest to the four requirements. According to the Second Troszak Declaration (and as reflected on the docket in the Chapter 11 Cases), Development Specialists, Inc. ("DSI") was authorized by the Court to act as a restructuring advisor to the Debtors.[117]  Post-Effective Date, DSI was engaged to provide forensic accounting and financial advisory services to the Wind-Down Entity and the Liquidation Trust.[118]  Mr. Troszak, a Managing Director of DSI, has been working with the Debtors' business records since 2018.[119]  Mr. Troszak represents that he is fully familiar with how the Debtors'

---

[114]  D.I. 83 (Second Troszak Decl.) at ¶ 4.

[115]  D.I. 83 (Second Troszak Decl.) at ¶ 4.

[116]  D.I. 83 (Second Troszak Decl.) at ¶ 4.

[117]  D.I. 83 (Second Troszak Decl.) at ¶ 2.

[118]  D.I. 83 (Second Troszak Decl.) at ¶ 2.  *See also* D.I. 573 (Order, Pursuant to 105(a) and 363(b) of the Bankruptcy Code, Authorizing the Debtors to (I)(A) Retain Development Specialists, Inc. as their Restructuring Advisor, (B) Designate Bradley D. Sharp as Chief Restructuring Officer, *Nunc Pro Tunc* to January 26, 2018, and (C) to Utilize Additional DSI Personnel; and (III) Approving the Agreement Related Thereto).

[119]  D.I. 83 (Second Troszak Decl.) at ¶ 2.

records were organized, regularly maintained and segregated, and has continuously accessed

such records in support of his duties.[120]  Further, he represents he is familiar with the Debtors'

computer software, QuickBooks, which the Debtors utilized for recording deposits and

disbursements of cash.[121]  He represents that all entries located in Exhibit B to his declaration

(the commission payments) were last modified/accessed by a Woodbridge employee, on March

10, 2017 at 8:45 am, which was subsequent to the latest dated check.[122]  Mr. Troszak represents

that the copies of the checks and bank statements are located within the business records of the

Debtors.[123]  The monthly bank statements of Comerica Bank have been a regular business record

maintained by the Debtors.[124]  Comerica Bank also produced bank records pursuant to subpoenas

issued by the Debtors.[125]  Mr. Troszak is familiar with the activities of the Debtors and is

qualified to attest to the foundational requirements enumerated in Rule 803(6).  The documents

are therefore admissible as evidence.

Fourth, the Defendant argues that since Trustee is a successor to the Debtors and stands in

the shoes of the Debtors, the Trustee and the Defendant are joint wrongdoers.[126]  The Defendant

argues the Trustee, as a result, may not recover the Transfers.[127]  According to Defendant, "the

court, on the above law cannot participate in the scheme of redistributing the ill-gotten gain

between joint wrongdoers."[128]

---

[120]  D.I. 83 (Second Troszak Decl.) at ¶ 2.

[121]  D.I. 83 (Second Troszak Decl.) at ¶ 2.

[122]  D.I. 83 (Second Troszak Decl.) at ¶ 4.

[123]  D.I. 83 (Second Troszak Decl.) at ¶ 4.

[124]  D.I. 83 (Second Troszak Decl.) at ¶ 2.

[125]  D.I. 83 (Second Troszak Decl.) at ¶ 2.

[126]  Adv. D.I. 82 (Response) at p. 6–8.

[127]  Adv. D.I. 82 (Response) at p. 6–8.

[128]  Adv. D.I. 82 (Response) at p. 8.

The Court disagrees.  Section 548 of the Bankruptcy Code expressly gives a trustee the power to avoid fraudulent transfers.[129]  "Defendant cannot raise the *in pari delicto* defense against Trustee as Trustee is using his avoidance powers and in so doing is not standing in the shoes of Debtor, but rather in the shoes of a creditor."[130]

Further, the Seventh Circuit in *Scholes v. Lehmann*[131] explained, in a Ponzi scheme, the reasoning that a wrongdoer must not be allowed to recover property that he had parted with in order to thwart creditors falls away once the controller of the corporation has been ousted from control and beneficial interest in the corporation.[132]  "The defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated."[133]  The Third Circuit in *McNamara v. PFS* adopted the reasoning from *Scholes* when faced with a similar assertion.[134]  The Third Circuit explained that the bad actor was eliminated and the trustee came to the court with clean hands.[135]  "If the doctrine of imputation were applied to bar [the debtor's] recovery, that application would lead to an inequitable result (loss to innocent creditors)."[136]  Ultimately, the court held, "nothing in the language of § 548 precludes us from considering the replacement of [the bad actor] by the Trustee and the concomitant removal of the taint of [the bad actor's] fraud from [the debtor], and we hold that [the bad actor's] conduct will not be imputed to the Trustee."[137]

---

[129]  11 U.S.C. 548(a)(1).

[130]  *Marshack v. JGW Solutions, LLC (In re Litig. Practice Group P.C.),* Adv. Pro. No. 8:23-10-01148-SC, 2024 Bankr. LEXIS 3145, *34 (Bankr. C.D. Cal. Mar. 27, 2025).

[131]  *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995).

[132]  *Id.*; *see also Donell v. Kowell*, 533 F.3d 762, 777 (9th Cir. 2008).

[133]  *Scholes*, 56 F.3d at 754.

[134]  *See McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*, 334 F.3d 239, 246 (3d Cir. 2003).

[135]  *Id.*

[136]  *Id.*

[137]  *Id.* at 247.

Here, the Trustee comes to this Court with clean hands.  Shapiro, the person in control of Woodbridge at the time of the Ponzi scheme, is no longer a part of that company.  The Trustee is suing on behalf of the bankruptcy estate to recover money to be distributed to creditors who were wronged pre-petition.  Therefore, the Court will not impute Shapiro's conduct to the Trustee.

### 4. Defendant has Not Established a Defense Under Section 548(c) of the Bankruptcy Code or Section 3439.08(a) of the California Civil Code

Section 548(c) of the Bankruptcy Code creates a defense for an initial transferee of a fraudulent transfer if they received the transfer for value and in good faith.[138]  The CUVTA includes an analogous defense.[139]  The Defendant bears the burden of proof on this defense, and thus to defeat the avoidance of a transfer on summary judgment, the Defendant must offer affirmative evidence sufficient to create a material issue of fact as to whether she took for value and in good faith.[140]

The Defendant has not sufficiently provided facts or evidence to establish that she has any applicable defense.  More specifically, as discussed above, Defendant has not submitted evidence establishing that she provided "value" to the Debtors, nor does she dispute the legal standard argued by the Trustee – namely, that the recruitment of new investors to a Ponzi scheme does not constitute "value" for purposes of fraudulent transfer statutes.  The value and good faith

---

[138] *See* 11 U.S.C. § 548(c) ("[A] transferee . . . of such a transfer . . . that takes for value and in good faith has a lien on or may retain any interest transferred . . . to the extent that such transferee . . . gave value to the debtor in exchange for such transfer . . . ."). (Providing a defense to transferees who took in good faith and for reasonably equivalent value).

[139] *See* Cal. Civ. Code § 3439.08(a) ("A transfer or obligation is not voidable under paragraph (1) of subdivision (a) of Section 3439.04, against a person that took in good faith and for a reasonably equivalent value given the debtor or against any subsequent transferee or obligee.")

[140] *Schneider v. Barnard*, 508 B.R. 533, 551 (E.D.N.Y. 2014) ("Because Bankruptcy Code § 548(c) is an affirmative defense, the transferee bears the burden of establishing all elements of the . . . defense."); *In re Bayou Grp., LLC*, 362 B.R. at 631 ("The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense."); *In re Cohen*, 199 B.R. at 718 (citations omitted) ("The issue of good faith under [the CUVTA] is a defensive matter as to which the defendants asserting the existence of good faith have the burden of proof.").

defense under 11 U.S.C. 548(c) are conjunctive, therefore, the Defendant must prove she provided "value" and was a "good faith" transferee.  Because the Defendant provides no evidence of value to Debtors, the Court need not adjudicate good faith.[141]

### 5.   Conclusion as First and Third Claims

The Court finds that there is no genuine dispute that the Debtors were operated as a Ponzi scheme and that the commissions paid to Defendant for her promotion and sale of the Debtors' fraudulent securities were related to and in furtherance of the Ponzi scheme.  The Transfers are avoidable pursuant to section 548(a)(1)(A) and California Civil Code § 3439.04(a)(1).

Insofar as the Trustee has met his burden to prove each of the Transfers were made with actual intent to hinder, delay, or defraud creditors, the Court need not reach the merits of the Trustee's argument that the "badges of fraud" also establish actual intent to hinder, delay, or defraud creditors.

---

[141]  *See Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006) (holding that because the broker defendant could not have provided value, "we need not draw a conclusion on good faith").  To determine whether a transfer was in good faith, courts "look to what the transferee objectively 'knew or should have known' . . . rather than examining what the transferee actually knew from a subjective standpoint."  *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 535–36 (9th Cir. 1990).  In the Response, the Defendant states: "the question of illegality came up, she was assured by the Debtor there was no need for any license to sell the investments and that the sales were legal." Adv. D.I. 82 (Response) at § I, p. 1.  Good faith is not present "if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose." *Hayes v. Palm Seedlings Partners-A (In re Agric. Research & Tech. Grp., Inc.)*, 916 F.2d 528, 535–536 (9th Cir. 1990).  The Court agrees with the Trustee that, the Brundage Declaration and her Response acknowledge her awareness of illegality in selling unlicensed securities.  An inquiry with any state regulatory authority likely would have confirmed that selling the Woodbridge Units and Notes was illegal.  Further, the Trustee notes that the Defendant was specifically asked for documents regarding her inquiries to state regulatory authorities and produced no documents.

### C. Second and Fourth Claims: Constructive Fraudulent Transfers

#### 1. Debtors Received Less Than Reasonably Equivalent Value in Exchange for the Transfers and Were Insolvent on the Date of Such Transfers

The Second and Fourth Claims assert that the Transfers were constructive fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code and section 3439.04(a)(2) of the California Civil Code.[142]

To establish that the Transfers were constructively fraudulent under the Bankruptcy Code, section 548(a)(1)(B) requires the Trustee to show that the Debtors received less than reasonably equivalent value in exchange for such Transfers and was insolvent on the date of such Transfers or became insolvent because of the Transfers. Under the Bankruptcy Code, inability to pay debts as they come due constitutes "insolvency" for purposes of the constructive fraudulent transfer test.[143]

Here, both constructive fraudulent transfer elements are satisfied. First, numerous courts have determined that a salesperson's or broker's solicitation of an additional investor in a Ponzi scheme provides no value to the debtor because it can "only exacerbate the harm to the debtor's creditors."[144] As the Fifth Circuit noted in *Janvey v. Gold Channel, Inc.,* "given that Ponzi schemes, by definition, create greater liabilities than assets with each subsequent transaction, each new investment in the [] Ponzi scheme decreased the value of the estate by creating a new

---

[142] *See* Adv. D.I. 1 (Compl.) at ¶¶42

[143] The Bankruptcy Code defines insolvent as "the financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation." 11 U.S.C. § 101(32).

[144] *In re Randy*, 189 B.R. at 441. *See also In re Rodriguez*, 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) ("[a]s a matter of law, the defendant gave no value to the debtors for the commissions attributable to investments made by others" into a Ponzi scheme); *Bell v. Disner*, No. 3:14CV91, 2016 WL 7007522, at *12 (W.D.N.C. Nov. 29, 2016), *aff'd sub nom. Bell v. Li Yu Chen*, 731 F. App'x 239 (4th Cir. 2018) ("[C]ourts have routinely and specifically held that there is no value in recruiting new investors to a fraudulent scheme."); *Carroll v. Stettler*, 941 F. Supp. 2d 572, 581 (E.D. Pa. 2013) ("Because the selling of investments in furtherance of a Ponzi scheme serves only to perpetuate an illegal fraud, the value conferred by the salespeople is illegal in its nature. Thus, as the argument goes, no exchange of reasonably equivalent value could have taken place.").

liability that the insolvent business could never legitimately repay."[145]  Defendant's recruitment
of new investors into the Ponzi scheme provided no value.

Second, the Debtors were insolvent at the time of the Transfers through the Initial
Petition Date.  As set forth in the Opinion on Confirmation, the Court found "[t]he annual cash
flow from sales of real property was well below the amount of principal and interest paid by
Shapiro to investors."[146]  For every year from 2013 to 2017, the income derived from the sales of
real property was well short of the amount required to pay investors their principal and
"profits."[147]  The Debtors could not pay investors from their legitimate existing operations.[148]
The Debtors used funds received primarily from new investors to make payments to old
investors.[149]

In addition, the Court found "beginning no later than July 2012 through December 1,
2017," Shapiro used his companies, including Debtors, "to conduct a massive Ponzi scheme."[150]
Courts have held that "an enterprise engaged in a Ponzi scheme is insolvent from its inception
and becomes increasingly insolvent as the scheme progresses."[151]  Thus, the evidence establishes
that the Transfers were constructively fraudulent under section 548(a)(1)(B) of the Bankruptcy
Code.

---

[145] *Janvey v. Gold Channel, Inc.,* 792 F.3d 539, 546 (5th Cir. 2015). *Warfield v. Byron,* 436 F.3d 551, 560 (5th Cir. 2006) ("It takes cheek to contend that in exchange for the payments he received . . . the Ponzi scheme benefited from his efforts to extend the fraud by securing new investments.").

[146] *In re Woodbridge Group of Companies, LLC,* 592 B.R. at 766.  *See also* D.I. 77 (Mem.) at ¶18 (*citing* Sharp Decl. ¶ 24).

[147] D.I. 2829 (Sharp Confirmation Decl.) at ¶ 24.

[148] D.I. 2829 (Sharp Confirmation Decl.) at ¶¶ 24–25.

[149] D.I. 2829 (Sharp Confirmation Decl.) at ¶¶ 25.

[150] D.I. 2903 (Confirmation Order) at ¶ NN.

[151] *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 196 (5th Cir. 2013) (citations omitted) (finding "a Ponzi scheme is, as a matter of law, insolvent from its inception."); *Floyd v. Dunson (In re Ramirez Rodriguez)*, 209 B.R. 424, 431-32 (Bankr.S.D.Tex.1997); *In re Randy*, 189 B.R. at 441; *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D. Ohio 1993).

The Fourth Claim seeks relief under section 3439.04(a)(2) of the California Civil Code.[152]  The Complaint does not cite to, nor address a claim under, section 3439.05 of the California Civil Code.  The Memorandum, on the other hand, in addressing the Fourth Claim, cites to, and relies upon, section 3439.05(a) of the California Civil Code.  Further, paragraph 69 of the Memorandum argues that the evidence establishes constructive fraud under section 3439.04(a)(2) and seeks summary judgment section 3439.05.[153]

Although California law allows claims under California Civil Code sections 3439.04(a)(2) and 3439.05 to avoid constructive fraudulent transfers, here the Complaint does not assert a constructive fraudulent transfer claim under section 3439.05, thus summary judgment cannot be considered on that basis.  Further, the Motion is silent as to which of the two statutory provisions serves as the grounds for the relief, and the Memorandum, as noted, cites to both sections.  "A party is not allowed to raise a claim in summary judgment which was not pled in the operative complaint."[154]  Consequently, the Court will not grant summary judgment as to the Fourth Claim.

---

[152] *See* Adv. D.I. 1 (Compl.) at ¶¶42.  *But see* Adv. D.I. 77 (Mem.) at ¶¶ 4, 69.

[153] *See* Adv. D.I. 77 (Mem.) at ¶69. ("The evidence thus establishes beyond dispute that the Transfers were constructively fraudulent under both section 548(a)(1)(B) of the Bankruptcy Code and **California Civil Code § 3439.04(a)(2).**  Moreover, for all of the reasons set forth in Part IV.B.2, supra, Defendant is not entitled to a "for value and in good faith" defense under Bankruptcy Code section 548(c) or analogous state law.  The Liquidating Trustee is entitled to summary judgment on his Second Claim (avoidance and recovery of the Two Year Transfers under section 548(a)(1)(B) of the Bankruptcy Code) and Fourth Claim (avoidance and recovery of the Four Year Transfers under **California Civil Code § 3439.05**.") (emphasis added).

[154] *Nationwide Judgement Recovery Inc. v. Sorrells (In re Sorrells)*, 644 B.R. 158 (Bankr. E.D. Tex. 2022) (citing *Cutrera v. Board of Supervisors of La. State Univ.,* 429 F.3d 108, 113 (5th Cir. 2005); *Lawmaster v. Ward*, 125 F.3d 1341, 1345 fn. 2 (10th Cir.1997) (holding that the court will not consider claims first raised in a motion for summary judgment and not contained in the complaint)).

    **2. Defendant Has Not Established a Defense Under Section 548(c) of the Bankruptcy Code**

As discussed above, the Defendant has not sufficiently provided any facts or evidence to establish that she has any applicable defense.

    **3. Conclusion as Second and Fourth Claims**

The Court finds that there are no disputes of material facts that prevent the Court from finding in favor of the Trustee and against the Defendant on the Second Claim. As to the Fourth Claim, the request for summary judgment is denied as set forth herein.

    **D. Prejudgment Interest**

The Complaint seeks prejudgment interest on the Transfers.[155] In the Memorandum, the Trustee proposes that the Court defer consideration of the prejudgment interest calculation until entry of a final judgment and states: "In the event the Court desires supplemental briefing or evidence on Plaintiff's entitlement to prejudgment interest or the calculation thereof, Plaintiff will submit such briefing or evidence as requested by the Court."[156] In light of the absence of argument (and evidence), the Court does not address, nor award, prejudgment interest.

<u>**CONCLUSION**</u>

For the foregoing reasons, there are no disputes of material fact that prevent the Court from finding in favor of the Trustee and against the Defendant with respect to the First, Second and Third Claims. A separate order consistent with this Opinion will issue.

Dated: October 20, 2025

                                 J. Kate Stickles
                                 United States Bankruptcy Judge

---

[155] Adv. D.I. 1 (Compl.), Prayer for Relief ¶ 2 (requesting prejudgment interest).

[156] Adv. D.I. 77 (Mem.) at ¶10, n. 6.